We will call the case of Stephen, help me out with the pronunciation of the last name here. Guilmeus. Guilmeus, Stephen Guilmeus v. Attorney General. Is it Ms. Batty? Yes, Your Honor. Morning. Morning, how are you? Great, thanks. Yourself? Good, thank you. Good morning, Your Honors, may it please the court. My name is Upneet Bahadi and I represent the petitioner, Mr. Stephens Guilmeus. I would like to reserve three minutes for rebuttal. Absolutely. Thank you. Your Honors, this case bears emphasis to note that Mr. Guilmeus would rather stay in custody than be with his family. This court should reverse the BIA and IJ's decision and grant Mr. Guilmeus relief under the Convention Against Torture or at a minimum vacate and remand the directing the BIA to apply the correct legal standards here and to properly consider the evidence. There are two errors here. What did they fail to do? Did they fail to adequately consider the country reports and other submissions that were presented on his behalf? Yes, Your Honor. That and they failed to apply the correct legal standards that were applicable here. So applying the correct legal factors here required a consideration of those reiterated in Regulations 8 CFR 1206. As to the first error that Your Honor noted, they failed to consider the record evidence properly here and that clearly showed that Mr. Guilmeus established that he would more likely than not be tortured and that the government in Haiti would acquiesce to his torture. So they needed to make two determinations. One, more likely than not. Two, government acquiescence. As to the first prong, they have to consider all the evidence regarding future events. Not what's happening now, but once he goes back to Haiti, what might occur. Can I? Maybe I'm interrupting you too quickly, but I had this thought. He can always go back to Haiti, to virtually any part of Haiti. I mean, he's worried about being tortured maybe by people that he lived nearby or in the same community that he lived in. Or his grandfather, I understand, had some harsh words for him. But he doesn't have to go back to the same place. He can go to virtually any place in Haiti to avoid what you say he's afraid of. Yes, Your Honor, that is correct. As a matter of fact, if I'm not mistaken, he's been gone for 12 years. So the circumstances may not be the same when he goes back. He can go back to any place in Haiti. Yes, Your Honor, that is correct. He could relocate to any part of Haiti. However, the country conditions reports show the pervasiveness throughout Haiti against the LGBTQ community, that they are being tortured, harassed. The police is doing nothing about it till this day. We have reports from 2018. We have articles from 2017 and 2018 showing that the pervasiveness of the violations against the LGBTQ community is still very prevalent. But aren't there also reports that lately this does not seem to be the situation, that the attitude of the police is improving? Your Honor, that's marked in one report, the State Department report from 2018. And the IJ and BIA did reference that report. It's one paragraph, a couple of sentences, noting that there is marked improvement by the police and that they are receiving training. My first point to that is that compared to the rest of the evidence, where there are over a dozen noted, detailed instances of things that are happening against the LGBTQ community, that was disregarded. None of that was considered in the IJ or BIA's decision. Two, this court has held several times that government opposition to any kind of feared torture, such as that which Mr. Gilmaze is alleging, or training by the police is not dispositive and is not sufficient to overcome a fear of torture and the likelihood of that torture or the fact that the government will acquiesce to that torture. So, for instance, Butt is a very informative case here where the petitioner intercast marriage, there was an intercast marriage, family members, just like here, were torturing her, threatened to torture her once she left. The BIA and IJ noted that there were marked improvements in the country. This court came around and said there are marked improvements, but there are also reports showing that there is still pervasive violence against folks who marry within different castes. That is the situation here, Your Honors. In fact, the IJ and BIA only considered one paragraph, as I said before, versus several instances of the acts of violence that are occurring against the LGBTQ community. Further... May I ask you a question from the preceding hearing that he had?  He was under cross-examination, and he stated that he does not have any fear of the government in Haiti, and he does not believe that anyone that works for Haitian government will harm him. This seems to be totally contrary to what you were just now saying. No, Your Honor. The fact that Mr. Gilmaze is not arguing that, and neither do we take the position, that the government will do something against Mr. Gilmaze, and that's not required under this court's precedent. We don't have to find that a government actor will act against a petitioner. Where does the fear of going back to Haiti come from? It's the acquiescence. It's the fact that Mr. Gilmaze's family will do something to him. But can't he relocate? I mean, he doesn't have to go back to where he lived before. He can always relocate. Haiti is not a small place. It is not a small place, Your Honor, but the fact that the country condition reports show that the violence against the LGBTQ community is throughout Haiti, one, and two, the factor that Your Honor is noting, the possibility of relocation, the BIA and IJ were required to make that finding, and nowhere is it mentioned in their decisions. The four factors reiterated in 8 CFR 1208. The second one is whether there's a possibility to relocate. The IJ and BIA did not make that factual finding. It did not note whether Mr. Gilmaze has the resources. This is not like Jasmine, where the petitioner was well off. His father had businesses in Haiti. He could relocate to wherever he needed to. This is not that situation, Your Honor. You say they did not make that factual finding. Were they asked to make a factual finding? They're required to. Under this Court's precedent, they are required to make findings under those four factors, namely past torture, relocation, whether there's gross flagrant or massive violations of human rights, and other relevant information of country conditions. The BIA and IJ only cited two and only made one finding as to the first factor, past torture. And again, this Court has also noted that a lack of past torture is not dispositive. Nor is violence from his family a factor that would prevent him going back. It's the acquiescence of the police. And yet, in his testimony, as quoted by Judge Fuentes, he says he has no fear of the police. Can't he go to the police and say, protect me? No, Your Honor, and Mr. Gilmaze testified to that as well. He doesn't fear that the government will torture him, but he is scared that the government is not going to do anything. And that's on page 168 of the record, where he said, I am scared to tell anybody that I am bisexual. I don't think the police is going to do anything in Haiti. The government in Haiti is corrupt. He mentioned that in his testimony. How would he know that? He hadn't been back there in 12 or so years. No, Your Honor, but again, the country conditions report substantiate Mr. Gilmaze's claim. And the IJ and BIA did make positive credibility findings. His mother, his sister, they've all testified to the same. And again, the country conditions reports absolutely show that the government is not willing to do things. There are instances of people's houses being burnt because they identify as LGBTQ. Being murdered in the public and the police is not doing anything. I believe you referenced two bills passed by the Senate there that were anti-gay in essence laws. Is that correct? Yes, Your Honor. Those have been passed in 2017. They're still pending the Superior Legislative Assembly there. But even then, the radio stations there are noting, you know, kill the gays and that's in the evidence. And the public there is now finding an excuse to be violent against the LGBTQ community based on these bills. They're looking for members to harass them because they think that these bills are now essentially law. Do you believe some of that comes from police in Haiti? I'm sorry, Your Honor? Do you believe some of that stems from or comes from police officers in Haiti or they are turning a blind eye to it? Yeah, absolutely, Your Honor. The country conditions report evidenced that. But they're not doing anything when there are violent acts committed against the LGBTQ community. They're standing by. Let me read a portion of the 2018 Haitian Human Rights Report that discusses that same issue. And it says there were no reports of police officers actively perpetrating or condoning violence against LGBTI individuals. They don't condone it. In fact, let me read the rest. Some civil society leaders noticed a marked improvement in the efforts of the Haitian police units to address the needs of the LGBTI community. So it sounds like they have been doing something about it for several years. Yes, Your Honor, but that's not, sorry. That's not reality, Your Honor. That's not enough under this court's precedent, more importantly. Is it our role to re-weigh the evidence that was before the IJ and the BIA? I mean, we can't re-weigh the evidence. Can we say, well, yeah, okay, they did hear evidence as Judge Fuentes has just described, but they also heard this other evidence. And can we look at that and say, yeah, we think that that weighing of evidence was wrong. So we're going to come out the other way. That's not our function. Absolutely not, Your Honor. But if you look at the IJ and BIA decisions, the evidence was not weighed at all. So what this court can do is vacate and send it back for further findings in line with this court's precedent. They need to look at the record. The decisions clearly show that the record was not considered at all. There's two sentences regarding this marked improvement. But the question of whether it's likely or not that Mr. Gilmaze will be tortured is a very important one. And the consequences here are very dire. The fact that they noted two sentences regarding marked improvement but did not discuss pages and pages, bullet points with specific evidence of what is happening against the LGBTQ community, the fact that that was all disregarded is one not in line with this court's precedent and holds dire consequences for Mr. Gilmaze. So this court can vacate and remand for the BIA and IJ to follow. So in this weighing function, where do we get to the point where we have to say we can, as a court of appeals, say the evidence was weighed wrong? It's not that it was weighed wrong, Your Honor. It's the fact that it wasn't weighed at all. The BIA and IJ didn't look at the record evidence. Had they done that, they would have provided a reasoning as to what is turning the table here. What is against Mr. Gilmaze? There is no balancing that's provided in the IJ and BIA decision, which this court has. But can you say they didn't look at it at all as a matter of fact from what is said in the record or from the fact that they don't discuss it in their decision? And so you say, well, we must conclude that they didn't look at it. Your Honor, I see my time is up. A combination of both, Your Honor. So looking at the evidence and then looking at the blatant disregard of it in the IJ and BIA's decision, those two together show that the BIA and IJ did not consider what was here. And this court has held several times in Putt, in Jasmine, in Zubeda, in Israel, that the BIA and IJ need to provide a wholesome review and reasoning that is embedded in the record. And they failed to do that. Thank you, Your Honor. Thank you. Mr. Robbins? Why don't we start where your colleague left off? So as I understand her position, she's saying that there's nothing in the opinions or the oral decision suggesting they really did an extensive review of the record submitted to them. First, Your Honor, Jonathan Robbins here on behalf of Mary Garland, the Attorney General. I would have to start off then, Your Honor, by respectfully disagreeing with my colleague that there's nothing in the decisions that indicates that the immigration judge considered the countervailing evidence. I would refer, Your Honor, to a number of portions in the immigration judge's decision. First of all, the immigration judge pointed out that even if she hadn't mentioned specific evidence in the record, she did state specifically that she had considered all of the evidence in the record. But then on page 59 of the record, the immigration judge- Is that enough? Is it enough for purposes of review for her to say, hey, I looked at everything, but I'm not going to discuss it? Well, that's just the starting point, Your Honor. There's more on the decision here. Specifically on page 59 of the record, the immigration judge specifically said that the respondent fears that the- specifically states, while he has submitted country condition evidence detailing mistreatment of gay and bisexual individuals in Haiti, reports of generalized brutality within the country will not necessarily show that he would be in danger of suffering torture upon his return, and then provides cites to the specific articles in question in the decision, which petitioner is now claiming that the immigration judge didn't consider. I would also refer you to the board's decision, which also provides cites to that same evidence. Now, I agree with you that the immigration judge and the board didn't specifically discuss those articles in great detail, probably because they weren't the most salient evidence in question. The question before the court with respect to the state action requirement was whether or not the government would consent or acquiesce to torture. And Judge Fuentes stole a little bit of my thunder on the opening presentation when he read the specific portions of the 2018 State Department report, which specifically addressed that precise issue, talking about how the police do not condone this- and they do not perpetrate violence against LGBTQ individuals. So it's not surprising that the immigration judge and the board would have focused more on that more salient information. But whenever there's a dispute over the weighing of the evidence, the stock challenge from the immigration bar is that the immigration judge didn't consider the countervailing evidence. That's just simply not the case here, because we have the specific cites in the decision to that countervailing evidence. And there's no requirement in the law that the immigration judge provide a lengthy detail about every single piece of information that's in the record. What we expect the immigration judge to do is to provide reasoning that is sufficient to understand why the decision is being made and to enable a proper review. And the immigration judge and the board both did that here. Now, there are two primary things that an individual has to show in order to demonstrate eligibility for cap protection. First, they have to show the requisite likelihood of harm, that it would be more likely than not that the individual would be subject to harm rising to the level of torture if removed to the home country. And then there's the second prong, which we sort of refer to as the state action prong, that is that the government in question would either consent or acquiesce to the torture. And the board and immigration judge in this case both reasonably explained that Petitioner didn't meet either of those two showings in this case. Now, with respect to the likelihood of facing harm rising to the level of torture, the Petitioner's claim is based entirely on threats that were made by his family, specifically his uncle and his two half-brothers. And the case law is relatively well established that only in very rare circumstances are threats going to be sufficient harm to rise to the level of persecution or torture. And in the rare instances where threats are sufficient to rise to that level of harm, what the courts generally have looked to is, is there some sort of likelihood that the threats are going to be followed through on? Is there some indication that there's an immediacy to the threats? And when the Petitioner in this case was asked specifically, why do you think that the family will follow through on these threats, he didn't really have much to say about it. He basically provided an answer that said, well, gay people aren't allowed in Haiti. They don't like gay people. But he didn't say anything that would indicate that they're actually likely to follow through on these threats. And so I think the immigration judge reasonably concluded that the Petitioner here hadn't shown that he's likely to meet that admittedly onerous standard of clear probability of likelihood of harm, which is a difficult standard to meet. And then, of course, I think probably even if the court were to disagree with that and find that the threats here were sufficient to make a finding of a likelihood of torture, there's still the obvious problem of the state action prong. Yes. I'm sorry. I didn't mean to cut you off. No, no. I'm just curious about his family. Yes. Which, according to him, has professed to do him very, very serious harm, and apparently he's reported it to the police agencies in Haiti. Nothing has been done. Isn't that something that should be considered in whether he has to go back to Haiti and go back to this area where he used to live and be subject to brutality by his uncle or grandfather? I'm not sure which. Well, Your Honor, I have to correct a specific factual assertion you just said. He testified that he did not report this to the police. He was asked by his own counsel whether he had reported the threats to the authorities, and his answer was no. And the immigration judge did make that observation in the decision as well. So he did not report that. Now, that's relevant because the Senate, when it ratified Catt, was very clear on what acquiescence means. Acquiescence means that the government is aware of the activity and then breaches a legal duty to intervene. And so I would say that the evidence in this case does not demonstrate acquiescence, specifically because we have no evidence. The only evidence that we have with respect to what the government would do in the most recent report is that they don't condone this. Now, of course, the petitioner has highlighted these sort of earlier reports, like the U.N. report and other reports in the record, where it says that back in 2012 and 2013 there were instances, sporadic instances, where the police did or were involved in violence. But you also have to show the requisite likelihood that the government would acquiesce. In other words, the clear probability standard applies to acquiescence. You know, turning a blind eye. Yes, or turning a blind eye. And so the State Department... What do you think about these bills? I'm not sure I'm using the right term, but these laws that are on the horizon that were referenced during the argument with your colleague, anti-LGBT bills. Well, Your Honor, I certainly think that if the petitioner had been tasked with demonstrating a clear probability of discrimination in the country, then he would probably have a much better case. But discrimination is not the same thing as torture. The case law establishes that things like discrimination, harassment, those aren't even sufficient to rise to the level of persecution, which is itself an extreme form of conduct. And then torture is an even more extreme form of harm than persecution. So I certainly think that that is evidence of discrimination, and I'm not here to suggest that there isn't pervasive discrimination or homophobia in the country. But when we're talking about an application for protection under the Convention Against Torture, we're talking about an extreme form of harm, the infliction of physical or mental pain or suffering. And while I certainly think it's deplorable that there is law that is perhaps marginalizing these people, that's not the same thing as saying that the government is going to acquiesce to torture. That's a very different question, and I think that the State Department report really demonstrates that that question hasn't been answered in the petitioner's favor in this case. So at its heart, what we have here, the only two things that the petitioner presented are the claim about the threats from the harm from his family and the generalized country conditions reports. There wasn't really much other evidence to analyze in the case. The immigration judge analyzed those things properly in the decision. I think the boards, again, with sites to the countervailing evidence that the petitioner is now claiming wasn't considered, and because the agency properly weighed that evidence, Judge Roth indicated that the standard of review in this case, of course, is that the record must compel a contrary conclusion. And since we have evidence in the record that indicates the police do not condone this, I don't think the record compels a fact finder to find that the government would acquiesce to torture in this case, not based on this record evidence. So unless the court has any further questions about the evidence or about any legal issues in the case, the government would submit on the briefs. Thank you. Thank you. Thank you for your time, Your Honors. Your Honors, I'd like to make a couple of points. My colleague says that the IJNBI noted that they considered all the evidence. As Your Honors noted, that's not enough. And again, it's been said in many decisions by this court that they need to provide some sort of wholesome record about analysis. It doesn't have to be lengthy, but some analysis needs to be provided. And I quote Myrie, you know, this court can't be speculating as to whether the evidence was considered or not. It needs to be sure that it was. My colleague also mentioned that the most salient evidence here was the fact that the police is not condoning violence in Haiti, noted in the 2018 State Department report, and that they're not actively participating in it. What that report doesn't mention is whether the past violations and past ongoing culture in Haiti against the LGBT community has been addressed. Nowhere in that report does it say that. In fact, the paragraph right below the one noted by my colleague says that there are still instances of the government not doing anything. The LGBTQ community organization that was referenced in that report was attacked. Their building was burnt down. They went to the police. The police did nothing. That is in that report in a paragraph right below it. I'm sorry. Could you repeat that, please? Yes. You said the police did nothing. The police did nothing. What was the incident that you're referring to? Yes. An organization, an LGBTQ organization in Haiti was attacked multiple times, and their building was burnt down. And they reported that. The judiciary and the police did nothing. That's in the paragraph right below the 2018 State Department report. Further, Your Honors, my colleague also notes that the likelihood of threats to be carried out here wasn't proven by Mr. Vilmaez, and that is an onerous burden. Yes, it is. But given the culture in Haiti and what we've seen in the country and conditions reports and the fact that Mr. Vilmaez has been receiving threats since 2011, more than a decade, he's been receiving threats from his family who is following his case. They know he's in custody right now, and they are saying things like they're going to chop his head off, shoot him, kill him, eliminate him.  Did he ever go to the police directly and make a report of these threats by his family to the local police? No, Your Honor. In fact, Mr. Vilmaez said he is scared to do so, and he doesn't want to do so because he is scared of revealing that he's bisexual. That's on page 168 of the record. He's been in the States since he came out, so to speak, right? Yes, he's been in the States. He hasn't reported it here. He hasn't reported it in Haiti. And this court has held that that's actually a consideration that weighs in favor of Mr. Vilmaez because it shows that he's actually in fear of what may happen to him should he report, and that's in Butte and in Mairi. Your Honor also noted the anti-LGBTQ bills that are being passed right now currently in Haiti. There's a 2018 article noting that. I see my time is up. Just if I could complete this quick statement. My colleague said that that just evidences discrimination. However, there is an article on page 334 of the record that notes that the public is taking those bills as an excuse to attack the LGBTQ community and that violence has continued. Thank you, Your Honors. Thank you. And thank you very much for taking this case on a pro bono basis, both to you and your law firm. It's greatly appreciated. Thank you for the opportunity. Thank you, counsel, for your arguments and your briefing. We will take this case under advisement.